GARY R. WHITMAN
February 9, 2010

```
 1              IN THE UNITED STATES DISTRICT COURT

 2            FOR THE SOUTHERN DISTRICT OF INDIANA

 3                   INDIANAPOLIS DIVISION

 4

 5                        - - -

 6    NICHOLAS A. GREEN      :   CIVIL ACTION

 7                           :

 8                           :

 9        VS.                :

10                           :

11                           :   Cause No.

12    FORD MOTOR COMPANY     :   1:08-CV-0163-LJM-TAB

13                        - - -

14

15          ORAL DEPOSITION OF GARY R. WHITMAN

16

17                   February 9, 2010

18

19                        - - -

20

21

22

23

24

25
```



BIENENSTOCK
COURT REPORTING & VIDEO
NATIONWIDE
Phone: 248.644.8888

```
 1    BY MR. SCHIFERL:
 2         Q.   I've marked as Exhibit 2 -- what is the
 3    item I marked as Exhibit 2?
 4         A.   I'm sorry?
 5         Q.   What is the item I've marked as Exhibit
 6    2?
 7         A.   This is my Curriculum Vitae.
 8         Q.   Sir, I know a lot of your background
 9    and all this, but let me ask, have you ever
10    participated as the designer of automotive
11    components that are incorporated in motor vehicles
12    sold to the motor vehicle public in the United
13    States?
14         A.   By the motor vehicle public, are you
15    excluding Army and soldiers?
16         Q.   I'm talking about vehicles that you or
17    I or anyone on the jury could go to a car lot and
18    purchase?
19         A.   I would say no.
20                   My participation in the design
21    of components has been for the Army, as far as
22    ground vehicles are concerned.
23         Q.   The work that you indicated as
24    specialized area, there are ten listed here.
25                   Let me ask, do you intend, in
```



1    A.   I did.

2    Q.   I don't want to put words in your

3    mouth, but you generally tend to provide testimony

4    in that area, as opposed to the testimony you just

5    described you understand Dr. Shanahan to be

6    providing?

7    A.   Well, I'm going to talk about the

8    kinematics, as I said, in terms of the general

9    kinematics as to what you expect to see in

10   rollover crashes based upon the type of restraint

11   and the design that we have here and the testing

12   that's been conducted on restraint systems.

13                  Dr. Shanahan, I think, will be

14   more case specific, in how those kinematics

15   resulted in the injuries that Mr. Green sustained.

16   Q.   Next you list down here, a specialized

17   area of, quote, human subject crash testing, end

18   quote.

19                  First of all, what do you mean

20   by that?

21   A.   Well, human subject crash testing would

22   be testing conducted with human subjects or

23   surrogates.

24   Q.   Did you conduct any such testing,

25   yourself, in this case?



    1      A.   No, I did not.

    2      Q.   Do you intend to offer any opinions

    3   about that matter in this case?

    4      A.   In regards to the testing that was

    5   conducted by Mr. Scott and Mr. Cooper, yes, I will

    6   be discussing that testing, but that's not testing

    7   that I was involved in conducting.

    8      Q.   Let me lay something perhaps to rest

    9   right away.

   10                   Have you read Mr. Cooper's

   11   deposition?

   12      A.   No, I have not.

   13      Q.   You've indicated -- you said the

   14   testing conducted by Mr. Cooper.  I'll represent

   15   to you that I took his deposition and in his

   16   deposition he indicated he did no testing.  That

   17   he was present when testing was done, but

   18   conducted no testing himself.

   19                   Were you aware of that?

   20      A.   I'm not aware of the exact role of

   21   Mr. Cooper versus Mr. Scott or anyone else that

   22   did the testing.

   23                   I know they were both there.

   24   I'm assuming that they both had some participation

   25   but what that exact participation was, I don't



1        Q.    Do you make it a habit, sir, of relying

2    for your testimony upon testing conducted by

3    counsel in cases?

4        A.    Do I make a habit of it?  No, I would

5    say it's not that common an event, but the testing

6    does exist.  So, I'm certainly going to look at it

7    for its merits.

8        Q.    Let me go into that a little further.

9                    Outside of this case, this

10   Green case, have you ever before relied upon

11   testing conducted by counsel in a case?

12       A.    I can't think of a specific case, but I

13   believe there has been testing conducted,

14   independent of me, by counsel.

15                   When you say conducted by him,

16   do you mean just his running the test or having

17   someone else run the test?

18       Q.    I'm talking about -- well, you've read

19   Mr. Scott's deposition; correct?

20       A.    Right.

21       Q.    You understood from Mr. Scott's

22   deposition that he was the test engineer, if you

23   would, as well as the surrogate in the test;

24   correct?

25       A.    Yes.



 1        Q.    Have you ever provided testimony, in

 2   which you rely on testing which was conducted by a

 3   plaintiff's counsel, where they were the test

 4   designer and participant, themselves, in the test?

 5        A.    I can't think of one off the top of my

 6   head, no.

 7        Q.    You list an area of specialty as a,

 8   quote, injury mechanism analysis, end quote.

 9                    What do you mean by that term

10   that would be different than the term, quote,

11   occupant kinematics we discussed before?

12        A.    Well, a part of my role, particularly

13   with the Navy, and since then, has been to analyze

14   test data, dummy response data, and compare that

15   to established injury criteria, to determine

16   whether or not the system is meeting requirements

17   and avoiding injury mechanisms.

18        Q.    Do you intend to provide testimony in

19   the area of injury mechanism analysis in this

20   case?

21        A.    In terms of performance restraint

22   systems, I'll be discussing that, but in terms of

23   what happened in this crash and the injury

24   mechanisms, that will be Dr. Shanahan.

25        Q.    You, in giving a description for injury



1    just articulating what I had said.

2         Q.   And, sir, I'm going to hand you a blank

3    piece of paper, labeled as Exhibit 3, along with a

4    pen, and ask you, would you please list on Exhibit

5    3 for me, all SUVs available in the public

6    marketplace to purchasers of vehicles in the

7    United States, that would meet the Federal Motor

8    Vehicle Safety Standards for SUVs and that meet

9    the Gary Whitman standard of appropriate crash

10   survivability?

11                    MR. SCOTT:  Are you talking now

12            or at the time of this event?

13                    MR. SCHIFERL:  In 1999.

14                    THE WITNESS:  I have not done

15            such a study, where I've gone out and

16            identified a particular SUV that meets my

17            requirements.

18                    I've simply looked at the

19            Explorer and looked at its features and

20            identified issues with it.

21                    I have not gone and looked at

22            alternative SUVs specifically.  So, I can't

23            give you a list such as that.

24                    - - -

25   BY MR. SCHIFERL:



```
 1        Q.   Well, I'm wondering, Mr. Whitman, you
 2   criticize, as we talked about, Ford Motor Company
 3   for not meeting what you believe to be appropriate
 4   standards.
 5              So, certainly, then, there's
 6   got to be someone out there, in the universal
 7   world of motor vehicle manufacturers, that would
 8   meet the Gary Whitman standard and I'm just
 9   wondering who they are?
10              MR. SCOTT:  I have to object to
11          the question as asked, because I think that
12          you have to include in the question up to
13          the point where this event occurred, and
14          this event occurred in 2006, as to the
15          designs that would have been available as
16          of 2006.
17              MR. SCHIFERL:  Well, actually,
18          counsel --
19              MR. SCOTT:  The question of
20          feasibility then becomes -- then becomes
21          the issue.
22              MR. SCHIFERL:  Well, actually,
23          counsel, the standard in Indiana, as you
24          well know, was judged as of the time of
25          manufacture of the product at issue.
```



BIENENSTOCK
COURT REPORTING & VIDEO
NATIONWIDE
Phone: 248.644.8888

 1   BY MR. SCHIFERL:

 2        Q.   So, my question remains, Mr. Whitman,

 3   certainly someone out there meets the Gary Whitman

 4   standard, and I'm just trying to find out who that

 5   is.

 6                     Are you able to tell us who it

 7   is?

 8        A.   I have not gone out and looked at each

 9   SUV, particularly that was available in 1999 or

10   before, and said, okay, this one has all the

11   features that I would look for in an SUV.

12                     I haven't been tasked to do

13   that.

14                     What I have done is I've looked

15   at the Ford Explorer and I've identified the

16   deficiencies that I believe that it has, that

17   fails to optimally protect the occupant.

18                     But I have not made any attempt

19   to identify 1999 vehicles that do or do not

20   incorporate features that I'm talking about.

21        Q.   So, if I were to ask a similar question

22   of you with our jury, you will be unable to answer

23   that question?

24                     MR. SCOTT:   I assume, again,

25             1999 or before?



```
 1                    MR. SCHIFERL:  That's correct.
 2                    THE WITNESS:  Right.  I have
 3           not done such a study to identify a
 4           specific alternative vehicle for 1999.
 5                    MR. SCHIFERL:  I think the
 6           record will speak as to what Exhibit 3 then
 7           is.
 8                         -  -  -
 9                    (Blank sheet of paper marked
10           for identification as Exhibit 3, not
11           retained by Court Reporter)
12                         -  -  -
13   BY MR. SCHIFERL:
14        Q.   Going back to Exhibit 2, sir, you have
15   listed an area of specialty of, quote, occupant
16   restraint systems design and testing, end quote.
17                    Do you intend to offer
18   testimony in that area?
19        A.   Yes.
20        Q.   I think I asked before, but let me just
21   make sure I'm clear.
22                    With regard to occupant
23   restraint system design, have you participated in
24   the design of any occupant restraint systems
25   incorporated into motor vehicles available for
```


BIENENSTOCK
COURT REPORTING & VIDEO
NATIONWIDE
Phone: 248.644.8888